UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JAMES R. DAVIS, II, | ) |
| Plaintiff(s), | ) ) ) |
| vs. | ) ) Case No. 4:06CV00065 RWS |
| CONNIE BARTON, et al., | ) ) ) |
| Defendant(s). | ) |

## MEMORANDUM AND ORDER

This matter is before me on Defendants Connie Barton, Susan Cox, Tracy Allison, Louis C. Tripoli, Ralf Salke, Cathleen Amico, Michael Sands, Joseph Ibrahim, and Dana Meyer's Motion for Summary Judgment [#53].

Plaintiff James R. Davis, II, brought this suit under 42 U.S.C. § 1983 alleging that the defendants violated his Eighth Amendment constitutional right against cruel and unusual punishment. Davis alleges that the defendants were deliberately indifferent to his serious medical needs because he received inadequate treatment for a range of medical problems.

The defendants move for summary judgment, arguing that: (1) Davis did not exhaust his administrative remedies prior to filing suit; (2) Davis has failed to show that the actions of Defendants meet the deliberate indifference standard necessary for an Eighth Amendment violation; and (3) Defendants Tripoli, Salke, Amico, and Meyer cannot be held liable for Davis' medical treatment under the theory of *respondent superior*.

Because I find that the defendants have not established that Davis failed to exhaust his administrative remedies, I will deny summary judgment on the basis of Defendants' argument of exhaustion. I will grant summary judgment in favor of the defendants on other grounds. I find

that viewing the facts in the light most favorable to Davis, a reasonable jury could not conclude that Defendants violated Davis' Eighth Amendment rights and will grant summary judgment in their favor on this basis. Additionally, I find that Defendants Tripoli, Salke, Amico, and Meyer cannot be held liable under the theory of *respondent superior* and will grant summary judgment in their favor on this basis.

Therefore, I will grant the defendants' Motion for Summary Judgment [#53].

**Background**

The undisputed facts of this case are as follows:

James Davis entered the Missouri Department of Corrections ("MDOC") at the Fulton Reception and Diagnostic Center ("FRDC") on July 8, 2004. Defendant Dr. Michael Sands was both the Medical Director and a physician at FRDC.

Before his incarceration, Davis had sustained a left knee injury requiring him to use a metal brace and a cane. Davis also had a pre-existing left shoulder injury which had required surgery. Davis also had collapsed arches on his feet for which he used shoe inserts. Davis had recently fractured the ulna on his right arm and the fifth metacarpal on his right hand which required an immobilizing brace.

Upon entering FRDC, Davis' wrist and knee braces, cane, and shoe inserts were confiscated. His wrist brace was replaced with an ACE bandage.

On July 15, 2004, Davis was seen by Dr. Sands regarding Davis' left knee instability. Dr. Sands requested a knee sleeve to help Davis travel from his cell to meals and to the medical facility. On July 23, 2004. Davis was provided with a knee sleeve and a right arm sling.

On August 1, 2004, Davis spoke with FRDC medical personnel about the pre-existing injuries to his right hand, right arm, right shoulder, and the fallen arch in his right foot. Davis complained about the confiscation of his wrist splint and shoe inserts.

On August 2, 2004, Davis underwent a series of x-rays of his right hand and arm. Davis alleges that the doctor who reviewed the x-rays informed him that his hand had healed incorrectly. However, the doctor's notes, as recorded in Davis' medical records, indicate a normal radiographic study. Davis blames his allegedly incorrectly healed hand on the ACE bandage that he was given to replace his wrist brace.

On August 10, 2004, Davis was seen by Dr. Sands regarding both his right and left shoulders. Davis told Dr. Sands that Davis had undergone surgery eight years earlier on his left shoulder. Davis also reported that ever since the surgery, Davis had repetitive dislocation of his shoulder when he reached out.

On August 12, 2004, Dr. Sands saw and assessed Davis for right wrist complaints. Dr. Sands noted that Davis was able to dress and that x-rays of his wrist did not show an acute or healed fracture. Dr. Sands submitted a request for Davis to undergo physical therapy for his wrist and shoulder trouble. The request was approved.

On August 15, 2004, Dr. Sands ordered x-rays of both of Davis' shoulders, as well as his cervical and thoracic spine. The x-rays revealed only evidence of pre-existing injuries and degenerative changes.

On August 20, 2004, Davis declared a medical emergency, complaining of back pain and spasms, as well as numbness in his legs. Dr. Sands treated Davis with Tordol and Vistaril injections in his deltoid muscles.

On August 23, 2004, Davis was seen by medical staff and referred to a doctor for shoe inserts to address Davis' complaint of flat feet.

Davis spoke with medical personnel on September 9, 2004, and again on September 11, 2004, complaining of back pain and requesting a knee brace and shoe inserts. Davis was provided with a cane following his September 11, 2004 medical encounter. On or about September 16, 2004, prison officials issued Davis two knee sleeves that had been sent by Davis' wife and approved by custody staff.

Davis filed an Informal Resolution Request while at FRDC which he states was "barely addressed."

On September 16, 2004, Davis was transferred to South Central Correctional Center ("SCCC"). Defendant Dr. Joseph Ibrahim was both the Medical Director and a physician at SCCC. Dr. Sands had no further involvement in Davis' medical care and treatment after Davis' transfer from FRDC to SCCC.

Upon Davis' arrival at SCCC, Davis declared a medical emergency, complaining of back pain. Davis' vital signs were assessed twice, after which Davis was transferred to the medical unit where hot packs were applied to his back. Davis reported that the hot packs helped his pain. Davis was observed in the medical unit and later returned to his housing unit by wheelchair.

On September 21, 2004, Davis was examined by Dr. Ibrahim for Davis' ongoing complaints of back pain, right and left shoulder pain, right wrist and fifth metacarpal concerns. Dr. Ibrahim ordered a series of spinal x-rays which subsequently showed a normal radiographic study. Dr. Ibrahim prescribed Ibuprofen for Davis and demonstrated proper lifting technique to help Davis decrease the strain on his back. Dr. Ibrahim also provided Davis with a rubber ball to be used for wrist and hand strengthening exercises. Davis was also issued a walker.

Davis asserts that he filed five Informal Resolution Requests Davis claims while at NCC, which he alleges "were never addressed."

On or about November 9, 2004, Davis was transferred to the Northeast Correctional Center ("NECC"). Dr. Ibrahim had no further involvement in Davis' medical care and treatment after Davis' transfer from SCCC to NECC.

On December 12, 2004, Dr. William Rice saw Davis at NECC for his pre-existing shoulder complaints, right hand, back and knees. Dr. Rice assessed Davis' ongoing orthopedic complaints and requested arch support inserts for Davis' shoes. Dr. Rice also ordered x-rays of both of Davis' knees and requested Davis' medical records from his prior healthcare providers.

On December 14, 2004, x-rays were conducted on Davis' right and left knees. The x-rays reported normal findings.

On February 21, 2005, Davis reported a dislocation in his left shoulder to the medical staff. Dr. Rice examined Davis' shoulder and called Dr. Rakestraw, who rotated Davis' shoulder back into place. Davis was prescribed Ibuprofen for five days and was given a sling for his left arm. Davis was put in a wheelchair because he could no longer use a walker.

On February 25, 2005, Davis' medical records report that Davis made his first request for an evaluation of "lumps" on his back. Dr. Rice examined the "lumps" and determined that there were multiple soft circumscribed movable masses in the pelvic area of Davis' back. Dr. Rice requested a biopsy of the back nodules and ordered Davis to continue using the splint for his left arm.

On February 25, 2005, Davis was assessed for continued use of a wheelchair because Davis had suffered a seizure. Davis was placed in a handicapped cell with railings to help his mobility.

On March 25, 2005, Dr. Rakestraw assessed Davis' complaint of blood in his stool. Dr. Rakestraw ordered blood tests. The blood testing results were within the normal range. Dr. Rakestraw also referred Davis to Dr. Benjamin Gaddy, a general surgeon, to assess the growths on his back.

Davis alleges that he filed five Informal Resolution Requests while at NCC, which he alleges "were never addressed."

On April 19, 2005, Davis was transferred to Farmington Correctional Center ("FCC"). Defendant Connie Barton was the Health Services Administrator at FCC. Defendant Dr. Susan Cox was both the Chief Medical Director and a physician at FCC. Defendant Tracy Allison was a Registered Nurse at FCC.

Upon entering FCC, Davis spoke with medical personnel about his left shoulder, right hand and arm, left knee, back pain, back growths, and gastro-intestinal bleeding. FCC medical staff began performing hemocult tests on each of Davis' bowel movements.

On May 2, 2005, Davis was issued a knee brace that had been sent by his wife.

On May 3, 2005, Davis was seen by Dr. Gaddy to evaluate the growths on his back.

On May 9, 2005, Dr. Gaddy admitted Davis to Central Missouri Medical Park for the surgical removal of the lesions on Davis' back. The masses were found to be benign lipoma. Davis was discharged from Dr. Gaddy's care and returned to FCC with medication and recovery instructions regarding the surgical excision site. Medical staff assessed Davis' surgical site and changed his dressings daily from May 10, 2005 to May 18, 2005. Davis' surgical site showed no signs of infection or problems. Dr. Gaddy saw Davis for a follow-up appointment on June 14, 2005 and reported that Davis' surgical site was well healed with no complications.

On June 20, 2005, Davis complained of his left shoulder condition to FCC medical staff. Davis was subsequently seen by Dr. David Messinger on July 6, 2005. Dr. Messinger recommended that Davis continue to use his sling and requested an MRI for Davis' left shoulder.

Dr. Cox examined Davis' left shoulder on July 22, 2005, and stated that Davis had not met the requirements for an MRI. Dr. Cox sent Davis to physical therapy for evaluation.

On July 25, 2005, Davis participated in physical therapy at NHC Rehabilitation.

On July 29, 2005, upon receiving the physical therapy evaluation, Dr. Cox requested an MRI for Davis' left shoulder which was approved. The MRI found evidence of mild cartilaginous narrowing of the glenohumeral joint but found no evidence of rotator cuff tear or joint space effusion.

On August 15, 2005, Dr. Cox submitted a request for Davis to receive an MRI of his lumbar spine. The request was approved and an MRI was performed on Davis. The MRI showed mild disc bulge at L4-5, L5-S1 and a mild facet joint hypertrophy. Stating that the problem was "not serious enough," the regional office did not initially authorize Davis to see a back specialist. In December 2005, Davis was examined by Dr. John Spears, a private neurologist, who concluded that the bulging disks were age related, and that Davis' MRI was normal for a thirty-six year old man.

On August 22, 2005, after complaining of a dislocated left shoulder, Davis was transported to the Parkland Health Center emergency room. X-rays of Davis' left shoulder were taken at the hospital, finding normal acute evidence of disease. Davis was discharged the same day.

On September 8, 2005, Davis was examined by Dr. Cox for his multiple orthopedic complaints and complaints of blood in his stool. Dr. Cox ordered an x-ray of Davis' right

7

shoulder. The x-ray showed a normal radiographic study. Dr. Cox also instructed Davis to stop taking Ibuprofen, and ordered further testing of Davis' stools. Davis' stools tested positive for occult blood. Based on these results, Dr. Cox referred Davis for a colonoscopy. Davis underwent a colonoscopy on November 2, 2005. The colonoscopy revealed a normal screening.

On October 5, 2005, Dr. Cox admitted Davis for observation and injections of pain medication for Davis' severe back pain. Davis reported some improvement and was discharged on October 6, 2005.

Dr. Cox requested that Davis be seen by an orthopedist for his left shoulder condition. On October 12, 2005, Davis was seen by Dr. Thomas Turnbaugh. Dr. Turnbaugh recommended that Davis see Dr. Timothy Galbraith, an orthopedic surgeon. Dr. Cox subsequently submitted a referral for Davis to see Dr. Galbraith.

On or about December 22, 2005, Davis was seen by Dr. Galbraith. Dr. Galbraith examined Davis' left shoulder and reviewed Davis' previous MRI. Dr. Galbraith advised Davis to discontinue use of the sling. Dr Galbraith recommended that Davis undergo an EMG of his left shoulder, an MRI of his neck, and if both tests showed normal results, a full course of physical therapy. Dr. Galbraith felt that surgical intervention was unnecessary. Dr. Cox approved Dr. Galbraith's recommendations.

On February 9, 2006, Davis underwent an MRI of his cervical spine. The MRI showed minor degenerative changes.

In March 2006, Davis underwent an EMG of his left shoulder and upper extrimity and an MRI of his neck. The EMG showed no sign of neuropathy. The MRI showed minimal degenerative changes.

On or about May 5, 2006, Davis complained of renewed pain and growths on his back. Dr. Gaddy was consulted and stated that surgery was inappropriate and unlikely to be effective.

Davis continued to complain to FCC medical staff of his shoulder complaints, which were assessed and treated, as needed, with physical therapy and medication.

On June 27, 2006, Davis declared a medical emergency, stating that his "knee popped out." Medical staff assessed and treated Davis' chronic knee complaint with ice and crutches.

On August 4, 2005, while at FCC, Davis filed Informal Resolution Request #FCC-05-782 regarding his medical treatment. Defendant Allison was responsible for responding to Davis' Informal Resolution Request. The Informal Resolution Request was denied. On November 29, 2005, Davis filed an Offender Grievance regarding his medical treatment which was also denied. Davis indicated that he would appeal the denial; however, Davis' grievance record contains no record of an appeal being filed.

**Legal Standard**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Lynn v. Deaconess Medical Center, 160 F.3d 484, 486 (8th Cir. 1998) (citing Fed. R. Civ. P. 56(c)). The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

When such a motion is made and supported by the movant, the nonmoving party may not rest on his pleadings but must produce sufficient evidence to support the existence of the essential elements of his case on which he bears the burden of proof. Id. at 324. In resisting a properly supported motion for summary judgment, the nonmoving party has an affirmative burden to designate specific facts creating a triable controversy. Crossley v. Georgia-Pacific Corp., 355 F.3d 1112, 1113 (8th Cir. 2004).

**Analysis**

Exhaustion of Remedies

Under the Prison Litigation Reform Act ("PLRA"), a prisoner filing a federal suit under 42 U.S.C. § 1983 regarding prison conditions must first exhaust all administrative remedies "as are available." 42 U.S.C. § 1997e(a). The exhaustion requirement extends to all prisoner suits regarding both "general circumstances" and "particular episodes." Porter v. Nussle, 534 U.S. 516, 532 (2002). Exhaustion is an affirmative defense; therefore, it is the burden of the defendant to prove that remedies have not been exhausted. Foulk v. Charrier, 262 F.3d 687, 697 (8th Cir. 2001). To exhaust all administrative remedies under §1997e(a), a Missouri offender must file an Informal Resolution Request, followed by an Inmate Grievance, and finally must file an Inmate Grievance Appeal. Smith v. Stubblefield, 30 F.Supp.2d 1168, 1174 (E.D.Mo. 1998).

Defendants argue that Davis has failed to demonstrate that he exhausted all of his administrative remedies. Davis argues that he attempted to exhaust, but that "the complaint was never processed." While inartfully worded, Davis' contention seems to be that he filed an appeal of the grievance, but that it was not properly submitted or processed by the prison staff.

Viewing the evidence in the light most favorable to Davis, the defendants have not shown that Davis failed to exhaust his administrative remedies. The defendants argue that Davis has

failed to allege exhaustion in his complaint or to attach any documentation supporting his claim of exhaustion. The defendants cite McAlphin v. Morgan, 216 F.3d 680, 682 (8th Cir. 2000), for the proposition that under § 1997e(a) a prisoner bringing a § 1983 suit must allege exhaustion in his complaint and, if possible, attach supporting documentation. However, in Jones v. Bock, 127 S.Ct 910, 921 (2007), the United States Supreme Court recently ruled that exhaustion is an affirmative defense and that "inmates are not required to specially plead or demonstrate exhaustion in their complaints." Thus, it is the burden of the defendants to show a failure to exhaust on the part of Davis.

The defendants produced both the Affidavit of Custodian of Records at FCC which states that Davis failed to file an appeal of his November 29, 2005 FCC grievance and Davis' FCC offender grievance file which contains no record of an appeal. However, Davis' position that the prison failed to "process" the "grievance" is consistent with the absence of related records in the grievance file. Indeed, Davis checked "I appeal this decision" on his November 29, 2005 FCC grievance. Viewing the evidence in the light most favorable to Davis, I find that a genuine issue of material fact exists regarding whether or not Davis exhausted his administrative remedies with regard to his FCC grievance.

Additionally, the defendants have not shown that Davis failed to exhaust his administrative remedies with regard to his claims against the NECC, SCCC, and FRDC defendants. In their Motion for Summary Judgment, Defendants addressed only the November 29, 2005 FCC grievance. Defendants failed to address the seven Informal Resolution Requests Davis claims to have filed at NECC, SCCC, and FRDC. Thus, Defendants have failed to show that the claims absent from Davis' FCC Informal Resolution Request had not previously been exhausted.

The defendants also argue that Davis failed to comply with the PLRA because he failed to name Defendants Barton, Allison, Tripoli, Salke, Amico, Sands, Ibrahim, and Meyers in his FCC Informal Resolution Request. However, in <u>Jones,</u> the United States Supreme Court ruled that "exhaustion is not *per se* inadequate simply because an individual later sued was not named in the grievance." <u>Jones</u>, 127 S.Ct. at 923.

Defendants have not presented evidence sufficient to show that Davis failed to exhaust his administrative remedies. I will deny summary judgment on the basis of exhaustion.

<u>Eighth Amendment Violations</u>

Defendants argue that Davis fails to state a claim for Eighth Amendment violations.

A state is required to "provide medical care for those whom it is punishing by incarceration." <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976). Prison staff violate the Eighth Amendment if they are deliberately indifferent to an inmate's serious medical needs. <u>Vaughan v. Lacey</u>, 49 F.3d 1344 (8th Cir. 1995). "The prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." <u>Jolly v. Knudsen</u>, 205 F.3d 1094 (8th Cir. 2000). Negligent misdiagnosis will not meet the deliberate indifference standard. <u>Smith v. Jenkins</u>, 919 F.2d 90, 93 (8th Cir. 1990).

In order to meet the deliberate indifference standard, an inmate who has been provided with medical care must show that his care "deviated from professional standards" and was "so inappropriate as to evidence intentional maltreatment." <u>Id.</u> An inmate complaining of a delay in treatment must "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." <u>Beyerbach v. Sears</u>, 49 F.3d 1324, 1326 (8th Cir. 1995).

In their Motion for Summary Judgment, Defendants do not contend that Davis' conditions did not amount to serious medical needs, nor do they contend that they were unaware of Davis' conditions. Therefore, I will assume for the purposes of this motion that Davis' conditions amounted to serious medical needs and that the defendants were aware of Davis' medical needs.

Defendants contend that Davis received adequate medical attention for his conditions. In his response, Davis argues that he has "established that the defendants acted with 'deliberate indifference.'" The defendants point to Davis' medical record to support their contention that Davis received adequate medical care for his conditions.

Dr. Sands and the FRDC medical staff provided Davis with medical treatment throughout Davis' time at FRDC. Dr. Sands first saw Davis regarding his left knee. Dr. Sands requested a knee sleeve for Davis to aid in mobility and stability. When Davis complained about his right hand and arm, he underwent diagnostic x-rays which showed normal results. When Davis saw Dr. Sands regarding his shoulder trouble, Dr. Sands had Davis undergo x-rays of both of his shoulders, as well as his thoracic spine. Dr. Sands also requested physical therapy for Davis. When Davis began to experience back pain, Dr. Sands ordered anti-inflammatory and anti-nausea injections, and Davis was later provided with a cane. When Davis complained about his flat feet, Davis was referred to a doctor for shoe inserts to address Davis' complaint. Additionally, prison officials issued Davis two knee sleeves, sent by Davis' wife, once the sleeves had been approved by custody staff. Davis has produced no evidence that the medical treatment he received from Dr. Sands was inappropriate and indicative of intentional maltreatment.

Dr. Ibrahim and the SCCC medical staff provided Davis with medical treatment throughout Davis' time at SCCC. Dr. Ibrahim responded to Davis' continuing back pain by providing hot packs to ease the pain in Davis' back, ordering another set of spinal x-rays,

13

prescribing Davis Ibuprofen, providing Davis with a walker, and instructing Davis in proper lifting technique. Dr. Ibrahim also provided Davis with a ball for performing wrist strengthening exercise. Davis has produced no evidence that the medical treatment he received from Dr. Ibrahim was inappropriate and indicative of intentional maltreatment.

Dr. Cox and the FCC medical staff have been providing Davis with medical treatment since his arrival at FCC. Dr. Cox examined Davis' left shoulder and sent him to physical therapy for an evaluation. Dr. Cox subsequently had Davis undergo an MRI of his left shoulder. When Davis complained of a dislocated left shoulder, medical staff had him taken to the hospital where x-rays were taken. Subsequently, Dr. Cox had Davis undergo another set of shoulder x-rays. Dr. Cox referred Davis to a private orthopedist, and then, based upon the orthopedist's advice, referred Davis to an orthopedic surgeon. Dr. Cox accepted the orthopedic surgeon's recommendation and ordered an MRI of Davis' cervical spine and an EMG of Davis' shoulder.

Dr. Cox had Davis undergo an MRI for his back pain which revealed some bulging disks. Davis was later seen by a private neurologist who concluded that the MRI showed normal results for a man of Davis' age.

Davis was sent to a private surgeon who removed the two growths Davis had discovered on his back. When Davis complained of additional growths, FCC medical staff consulted with a private surgeon who felt that further surgery was inappropriate.

Dr. Cox and the FCC medical staff conducted multiple tests on Davis' stools to diagnose his gastro-intestinal trouble. Dr. Cox also had Davis undergo a colonoscopy which reveled no abnormalities.

Davis has produced no evidence that the medical treatment he received from Dr. Cox was inappropriate and indicative of intentional maltreatment.

14

With regard to the remaining defendants, Defendants Allison and Barton, Davis has wholly failed to make any factual allegations regarding conduct on their part, deliberately indifferent or otherwise.

Although Davis received medical attention for his left shoulder, he specifically complains about the extended period of time between his injury and when he was first seen by an orthopedist. Davis also complains of the extended time he was forced to go without a knee brace or a cane. However, an inmate complaining of a delay in treatment must "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Beyerbach, 49 F.3d at 1326. Davis has failed to produce verifying medical evidence establishing any detrimental effect these delays had on his medical treatment.

The evidence before me demonstrates that the defendants provided medical care for Davis during his incarceration. Estelle, 429 U.S. at 103. Even were I to find that Defendants' actions were negligent, the Eighth Circuit has held that "[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Jolly, 205 F.3d at 1094. Negligent misdiagnosis will not meet the deliberate indifference standard. Smith, 919 F.2d at 93.

Davis has failed to demonstrate that his care "deviated from professional standards" and was "so inappropriate as to evidence intentional maltreatment." Id. Davis has therefore failed to establish a violation of his Eighth Amendment rights.

I will grant summary judgment in favor of the defendants on Davis' Eighth Amendment claims.

Respondeat Superior

"[R]espondeat superior is not a basis for liability under 42 U.S.C. § 1983." Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997). "[A] general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability." Id. The Eighth Circuit has held specifically that "a bare allegation that someone in supervisory authority has been deliberately indifferent, without any specification of that person's contact in fact with the plaintiff, nor even an explicit charge of inadequate training or supervision of subordinates" is not sufficient to establish liability under § 1983. Estate of Rosenberg by Rosenberg v. Crandell, 56 F.3d 35, 38 (8th Cir. 1995).

Defendants Tripoli, Salke, Amico, and Meyer contend that they cannot be found liable under a theory of *respondeat superior* because they were not directly involved in Davis' medical care. Davis alleges that all of the defendants were made aware of his medical condition and that they acted with deliberate indifference toward his serious medical needs.

All of the aforementioned defendants hold supervisory positions. Defendants Tripoli, Salke, and Amico are employed by Correctional Medical Services as Vice Presidents of medical affairs, operations, and clinical programs respectively. Defendant Meyer holds an unspecified supervisory position at NCC.

Davis has failed to present any evidence that these defendants were personally involved in his medical treatment. Nor has Davis alleged that these defendants inadequately supervised or trained their subordinates. Rather, Davis mentions these defendants in his complaint only to state in a conculsory manner that Meyer was deliberately indifferent to Davis' medical needs, and later on, to state that Tripoli, Salke and Amico acted with a "wanton disregard for the plaintiff's need for specialized treatment and care."

Because Davis has failed to produce evidence sufficient to prove that Defendants Tripoli, Salke, Amico, and Meyer were personally involved in his medical care, and because Davis has not alleged that these defendants inadequately trained or supervised their subordinates, I will grant summary judgment in favor of Defendants Tripoli, Salke, Amico, and Meyer on the basis of *respondeat superior*.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Barton, Cox, Allison, Tripoli, Salke, Amico, Sands, Ibrahim, and Meyer's Motion for Summary Judgment [#53] is **GRANTED**

_____
RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 21st day of September, 2007.